# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

BARBARA JEAN SMITH,

     Plaintiff,

vs.                                                                        Civil No. 05-203 WJ/LFG

THE CITY OF ALBUQUERQUE,
a New Mexico Municipality, and
JAMES MOORE and MILLIE
SANTILLANES, in their individual
and official capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Defendants' Motion for Summary Judgment (Doc. 60).  Having reviewed the parties' submissions and being fully advised on the relevant law, I conclude that Defendants' motion is well taken and will be granted.

## BACKGROUND

Plaintiff filed her initial Complaint in this matter in state court on January 28, 2005, and Defendants timely removed the case to this Court on February 23, 2005.  Plaintiff's Complaint alleges a claim for breach of an employment contract under state law, a claim of denial of procedural and substantive due process under the Fourteenth Amendment through 42 U.S.C. § 1983, a claim for violation of the Family Medical Leave Act, 29 U.S.C. §§ 2601 et. seq., a claim of Monell Liability (presumably a claim of municipal liability under 42 U.S.C. § 1983), and a claim for violation of the First Amendment through the Fourteenth Amendment and 42 U.S.C. § 1983.

Defendants filed the instant motion for summary judgment with regard to all of Plaintiff's claims. Viewing the evidence in a light most favorable to Plaintiff as the Court must in deciding a motion for summary judgment, the pertinent facts may be summarized as follows.

Plaintiff was hired by the City of Albuquerque on April 1, 2002 as a manager in the Cultural Services Department to perform various functions associated with opening the city's balloon museum.[1]  Plaintiff has a doctorate in education and has taught in college, preschool and high school in the subjects of history, art, art history and English.  When Plaintiff applied for the position, she was told by Cathy Gore, Plaintiff's co-worker, and Millie Santillanes, Plaintiff's supervisor, that she would ultimately become director of the balloon museum.  Plaintiff did not become director of the balloon museum, and a director for the balloon museum was never hired during Plaintiff's tenure.  A city ordinance regarding the balloon museum created the Balloon Museum Board of Trustees , gave the Board the power and duty to hire an executive director, defined the method to be used by the Board for selection and evaluation of an executive director, and provided that the executive director would prepare the budget for the museum.

During Plaintiff's employment, Millie Santillanes, Director of the Cultural Services Department, was Plaintiff's immediate supervisor.  Plaintiff believed that Defendant Jim Moore, Associate Director of the Albuquerque Museum of Art and History, was also her supervisor, but Moore has never signed any employment documents related to Plaintiff, and there is no evidence that Moore had any authority over Plaintiff, her employment, or the balloon museum.  Cathy

---

[1]Plaintiff's response states that Plaintiff was not, at first, employed by the Cultural Services Department and that her salary was paid, in part, by the Balloon Museum Foundation. However, the evidence cited by Plaintiff for these contentions does not support them.  In any event, I conclude that these are not material facts.

Gore, not a party to this litigation, was at times relevant to this case an employee of the City of Albuquerque in the Capital Improvement Project office.  She was Plaintiff's coworker and not Plaintiff's supervisor.   The Balloon Museum Board of Trustees (Board) was a City organization responsible for making policy with regard to the balloon museum.  Also involved in the balloon museum project was the Balloon Museum Foundation (Foundation), a private, non-profit organization responsible for fund-raising efforts.

Upon being hired in 2002, Plaintiff questioned the balloon museum's budget arrangements and spoke numerous times with the financial officer about the merged budgets.[2]  Plaintiff wanted direct accountability for expenditures for the balloon museum.  In the summer of 2002, Ms. Santillanes and Ms. Gore were involved in issues of a parking lot for the Atomic Museum. Plaintiff requested information about funds that were apparently being provided by the state regarding the Atomic Museum that were supposed to be paid to the balloon museum.  According to Plaintiff, Ms. Gore reported that the state owed the balloon museum $250,000 for the Atomic Museum parking lot.  Plaintiff made repeated requests for records of these funds until her employment was terminated.

Plaintiff's exhibits indicate that Plaintiff wrote a letter to Ms. Santillanes in March 2003 expressing concern that a new budget had cut out personnel positions for associate and assistant directors for the balloon museum.  The letter informed Ms. Santillanes that a world class museum must have a director.  In a letter written in January 2004, Plaintiff complained of a budget developed in her absence that appeared to assume that the balloon museum would not become an

---

[2]It is not clear in the record what Plaintiff means by "merged budgets" but there is an implication that the budgets for the balloon museum and the Albuquerque Museum were intertwined when it came to the ordering of supplies.

independent museum but would be affiliated with the Albuquerque Museum.  The letter strongly recommends that Plaintiff be moved into an associate director position for the balloon museum.

When Plaintiff was hired, she was told that there was a set aside of 3.2 million dollars for the balloon museum exhibits.  Within 6 months, the mayor announced that the entire amount was going to the architect for expansion of the museum building leaving nothing for construction of exhibits.  Plaintiff complained of this shift in funds at a meeting with Ms. Santillanes, Ms. Gore and several Board members.  She stated that this was not in keeping with promises made to her when she was hired.  She requested information regarding bids from other architectural firms and learned that the architect who had been hired went to school with the mayor.

In 2002, Ms. Gore informed Plaintiff that the balloon museum was responsible to the state for a $30,000 information desk in the entry to the museum.  Plaintiff asked for records of this expenditure and learned that the money had been taken in "clean up."[3]  According to Plaintiff she repeatedly asked for records of state and City contributions to the balloon museum and repeatedly asked Ms. Gore for accountability of building and capital improvement funds.  She never received records or accountability.  In late 2003 or early 2004, Plaintiff attended a construction meeting and questioned the expenditure of funds to change the color of the museum masonry.  Plaintiff was subsequently barred from attending construction meetings after a memo from the director of the City Department of Municipal Development to Ms. Santillanes asked that Plaintiff not attend further meetings.

---

[3]Nothing in the record explains the meaning of this.

In December 2003, Plaintiff submitted a grant proposal to IMLS, a federal program.[4]  The

face sheet of the grant application contains blanks for filling in specific information.  One of the

blanks requires the applicant to fill in the name of the museum director.  Plaintiff was not the

museum director but placed her own name in this blank.  She did, however, refer to herself as the

museum manager elsewhere in the application and in an e-mail to the contact person for IMLS.

The application indicated that the museum was regularly open and exhibiting to the public at least

120 days per year.  Plaintiff reported in the application that the museum was open to the public

from 9:00 a.m. to 5:00 p.m. Tuesdays through Fridays.  Plaintiff signed the application as the

"authorizing official" certifying that the information in the application was true and correct, that

all requirements for the application had been fulfilled, and certifying compliance with all

requirements of the ILMS Regulations and all other applicable federal statutes and regulations.

In a subsequent e-mail to the contact person at ILMS regarding the grant application,

Plaintiff described the "current museum program and the facility out of which it is operating."

See Exhibit 12 to Exhibit A attached to Defendant's Motion.  The e-mail indicated that the

museum was operating out of a warehouse pending completion of a new building, and that the

warehouse had been developed into a museum annex where public tours and programs were being

held.  Plaintiff reported that the adaptation of the warehouse for a publicly open museum had been

limited by budgetary constraints and that various museum groups, volunteer organizations, groups

of students, media, researchers, donors and focus groups for planning the new museum had been

given tours in the warehouse.  Plaintiff's testimony in her deposition indicates that no workshops

---

[4]IMLS is the Institute of Museum and Library Services within the National Foundation on
the Arts and Humanities established by 20 U.S.C. § 9102.

or classes were ever held in the warehouse.  When Ms. Santillanes learned of the grant

application, she withdrew it because there was "no museum at the time.  We were operating out

of a warehouse."  See Exhibit C pp. 20-21, attached to Defendant's Motion.  no operating

museum at that time.

Plaintiff, as museum manager, had no formal role in the actual construction of the balloon

museum other than to review plans and offer suggestions.  When she was initially hired, she was

permitted to attend meetings with the contractor responsible for building the new museum.  On

February 4, 2004, Ed Adams, Director of the City Department of Municipal Development, sent a

memo to Ms. Santillanes requesting that Plaintiff not attend any further construction meetings.  In

the memo, Mr. Adams reported that Plaintiff was communicating mixed messages to the

contractor, was providing the Board with misinformation and was impeding the free exchange of

information among the parties responsible for the construction of the museum.  The memo

indicated that Plaintiff appeared to believe that she should be or was controlling the construction

project.  Regardless whether the representations in the memo were correct and regardless whether

Mr. Adams authored the memo or simply signed it after it was authored by someone else, Ms.

Santillanes received the memo.  On February 11, 2004, Ms. Santillanes gave Plaintiff a written

warning for her alleged behavior at the construction meeting.

Beginning in January 2004,Tom Levine was the Director of the Foundation.  A major

donor to the project was the Carl C. Anderson Foundation.  The Anderson Foundation had

requested that its full name not be used in any press releases and that the Anderson foundation be

referred to as the Anderson Family Foundation to avoid a deluge of requests for funding.  A

newspaper article came out using the full name of the Anderson foundation.  Mr. Levine sent

Plaintiff an e-mail in March 2004 regarding the article and the use of the full name of the

Anderson Foundation.  Plaintiff responded by e-mail stating that she had nothing to do with the

newspaper article and further stating, "Finally, I think you should be sure of your target before

you swing, and as a matter of fact swinging isn't a good idea at all."  See Exhibit 11 to Exhibit A

attached to Defendant's Motion.  Mr. Levine, by e-mail, responded,

> Your response to my e-mail was inappropriate.  My e-mail was in no way intended
> to target anyone.  I was simply voicing a legitimate concern to the individual I
> thought most appropriate to handle the situation.  If you are not this individual,
> please let me know who is.

Id.  Plaintiff countered this with an e-mail stating, "I think you owe me an apology for your

inappropriate note.  Please do not write again."  Id.  Mr. Levine reported this interaction to the

Foundation and to Ms. Santillanes.[5]

When Plaintiff began to work for the City, the City owned a warehouse in which future

potential exhibits for the balloon museum were stored.  Cathy Gore was responsible for and in

charge of the warehouse.  At the time the warehouse was purchased, it was intended for

collection and storage related to the balloon museum.  The City never intended the warehouse to

be used for anything other than storage.  However, in July 2002, the Board did discuss dividing

the warehouse into space for storage and space for staff offices.

Ms. Santillanes and Cathy Gore were frequent visitors to the warehouse.  There were

official parties held at the warehouse in 2003, there were desks and fabric dividers between desks,

---

[5]Defendants contend that it is undisputed that Plaintiff was given a verbal warning for this.
However, Plaintiff does dispute this, and Defendants' proffered evidence does not conclusively
establish that Plaintiff received a verbal warning.

and Cathy Gore arranged for the installation of a computer line at the warehouse. When carpet was being installed at City Hall, Plaintiff moved her office from City Hall to the warehouse.

One of the groups of artifacts in the warehouse at the time Plaintiff was hired was the Soukup & Thomas collection which had been donated to the City. This collection contained some important and valuable items. Most of these were taken to the Albuquerque Museum for storage and less valuable items were stored at the warehouse. Items from the Albuquerque Museum were also stored at the warehouse. Plaintiff did not believe the Soukup & Thomas collection was being stored appropriately and told Cathy Gore that the collection was not being stored properly. However, Plaintiff has no knowledge that any item stored in the warehouse was compromised.

Plaintiff and Ms. Santillanes attended a meeting with the Chief Administrative Officer (CAO) James Lewis in December 2003. Plaintiff sent a memorandum to Mr. Lewis and Ms. Santillanes dated December 30, 2003 in which she referred to the warehouse as the "museum annex." The memorandum notes that the warehouse was being used primarily for storage but was also being used as the education and registrar's office as well as a volunteer office. In a timeline for the utilization of the warehouse, Plaintiff indicated that it would be used as a meeting space by January 2004. Plaintiff's memorandum contained a "rationale for retrofitting" and a partial estimate of the costs for retrofitting the warehouse. The estimate included costs for enclosing the collections area and museum shop storage area for security, but did not explicitly state that enclosing these areas would require the construction of walls. Mr. Lewis never authorized any expenditures for Plaintiff's proposed retrofitting.

In late December 2003 and early January 2004, Plaintiff asked for support from the Capital Improvement Project to build walls in the warehouse, but Ms. Santillanes refused this support.  Plaintiff told Ms. Santillanes she would investigate a volunteer project to build the walls. Plaintiff then informed Ms. Santillantes that she had obtained volunteers willing to construct the walls in the warehouse.  Plaintiff considered the project a volunteer project rather than a capital improvement to the building because the walls could be removed to return the warehouse to its original condition and because the labor and materials were donated.

On February 9, 2004, Plaintiff and Ms. Gore had an e-mail interaction in which Plaintiff stated she was going to use GO[6] funds for the temporary walls in the warehouse.  Gore countered that there were only enough GO funds for an architect to do a design but not enough funds for construction.  Plaintiff responded, "what architect?" and stated that what she was doing did not include an architect.  Ms. Gore replied that an architect was necessary to perform design work in order to enable the contractor to pull a construction permit, to review code issues for fire and safety, and to address risk management issues associated with using the annex for classrooms.  In spite of Ms. Gore's communication, Plaintiff honestly believed an architect was unnecessary and interpreted Ms. Gore's email as simply informing her of the budget limitations.

Plaintiff proceeded with the volunteer project to construct walls without an architectural design.  Richard Donovan, a member of the Foundation, a member of the Board and a volunteer, assisted with the project.  He testified that approximately fourteen volunteers participated in drafting floor plans.  Plaintiff and the volunteers collectively approved the final floor plan.

---

[6]The Court assumes this refers to General Obligation funds, but the actual meaning of "GO" is not material to this case.

9

Plaintiff gave Mr. Donovan and another volunteer the go ahead to construct the walls. Construction of the walls occurred in July 2004. In addition to constructing the walls, the volunteers also ran electric wiring and installed outlets in the walls. No architect was involved in the development of the plan and no architect signed off on the plan. While Mr. Donovan is an electrical engineer by trade, no electrician or electrical contractor supervised the wiring or outlet installation. Plaintiff's only efforts to make sure the walls were in compliance was putting Mr. Donovan and the other volunteer in charge. No permits were pulled for the construction of the walls. In addition to providing security for the collections and the museum shop storage areas, one of reasons that walls were constructed in the warehouse was that welding would need to be done to repair some of the exhibits, and there were concerns that debris would compromise other exhibits.

Someone placed an anonymous call to Bernalillo County Zoning and reported that there was interior construction without a permit occurring at the warehouse.[7] After the report was made, Ms. Santillanes and Ms. Gore met with the Chief Administrative Officer, James Lewis to discuss concerns about the construction at the warehouse. He requested that the City correct any problems to avoid the County having to "red tag" a city building. In the meantime, a County inspector went to the warehouse and noticed that a lot of construction activity had occurred within the warehouse. The inspector issued a preliminary notice that any construction in progress must stop. Plaintiff sent an e-mail to Ms. Santillanes regarding this inspection and reported that the inspector was "less concerned about the walls. That doesn't seem to be a big issue and can be

---

[7]The evidence indicates that Ms. Gore reported the construction to City Zoning and City Zoning informed the County. However, Ms. Gore is not a party to this case, and the source of the report is not material to the resolution of any issues in the case.

fixed." She further reported that the inspector had concerns about the coolers because they lacked permits. Plaintiff stated that the inspection that was instigated because of the walls actually exposed other deficiencies in the warehouse that existed prior to Plaintiff's employment.

Subsequently, Tobias Perea went to inspect to warehouse. Mr. Perea discovered multiple code violations that created safety risks. One violation was the use of a deadbolt lock on the front door. This lock required a key to unlock the door from the inside. Thus, it could not be easily opened in the event of a fire and could impede egress. Many of the new walls did not reach all the way to the ceiling. Walls that separate one type of occupancy from another must completely separate the areas to protect occupants from a fire that starts in another area. The walls were braced with wooden braces that were not distributed with sufficient frequency to brace the load of the walls. If areas are to used for open flame welding, walls and bracing must be constructed with noncombustible materials. Also noted were piles of combustible materials. Many of the code issues depended on the nature and use of the building. Mr. Perea had concerns that the City continued to occupy the space and was concerned about the safety of the occupants. He concedes, however, that he did not conduct a follow-up inspection of the warehouse.

Mr. Perea, Ms. Santillanes and others attended a meeting based on Mr. Perea's concerns that the warehouse continued to be occupied and there were continuing safety concerns. Ms. Santillanes decided to close the building to occupants and remove the walls. The City was required to hire a contractor to remove the walls at a cost of over $7,000.00. After the warehouse was closed, Plaintiff made an hour long presentation to the Board on how she was not culpable for the closure of the warehouse. One of the attendees at the meeting believed Plaintiff's presentation was inappropriate and an attempt to disparage Ms. Santillanes and Ms. Gore.

11

According to Defendants, the City was not aware that Plaintiff had authorized volunteers to construct walls in the warehouse. Plaintiff avers that she gave hard copies of nearly all her e-mails to Ms. Santillanes and copies of all Board and Foundation meeting minutes to Ms. Santillanes. However, Plaintiff does not aver that these communications specifically informed Ms. Santillanes that she had given volunteers the authorization to proceed with construction of walls in the warehouse.

The volunteers who constructed the walls testified that, if they had been injured during construction, they would have looked to the City for compensation. Plaintiff testified that she did check on the risk management implications of having volunteers doing the work and was told by the City Legal Department that it was standard procedure to allow volunteers to build temporary walls so long as the volunteers signed a form. Plaintiff's testimony indicates that she had the volunteers sign the forms as indicated by the City Legal Department.

After permits for capital improvements in the warehouse became an issue, Plaintiff alleged that Ms. Gore had made improvements to the warehouse without permits. Specifically, she alleged in her complaint in this matter that Ms. Gore had installed the computer line, coolers and shelving without obtaining a permit. Gore made these improvements at Plaintiff's request. Plaintiff's information that these improvements had been made without permits came from the County of Bernalillo Building and Zoning Inspector. Ms. Gore testified that she did not pull any permits for the work done at the warehouse because it was the responsibility of contractors doing the work to obtain the permits.

On August 24, 2004, the president of the Foundation wrote a letter to Ms. Santillanes regarding the closure of the warehouse and expressed concern about the security of the

collections stored there and the ability to take potential donors to view the collections.  On August 25, 2004, Ms. Santillanes wrote a responsive letter in which she stated that Plaintiff erected walls within the warehouse that violated County and City codes for commercial buildings, that this occurred after Plaintiff had been told that walls could not be erected without an architect, that the closure of the warehouse was the result of Plaintiff's failure to follow instructions, and that Plaintiff broke the law.

On September 2, 2004, after the closure of the warehouse, Ms. Santillanes gave Plaintiff notice that she was being transferred to the Bio Park without a reduction in pay.  Plaintiff was assigned to the position of curator of education.  Plaintiff was also notified that an investigation was being conducted into possible violations of city policy arising from Plaintiff having made modifications to the warehouse.

Under City Personnel Rules and Regulations, a transfer is not grievable.  Following her transfer, Plaintiff filed a grievance alleging that Ms. Santillanes failed to adequately supervise her, engaged in a continual pattern of harassment, failed to respond to her requests for support and assistance in creating an appropriate working environment in the warehouse, secretly reported the warehouse improvement activity to the County, and yelled at her in a meeting with Ms. Gore and the County inspector.  In alleging that Ms. Santillanes failed to adequately supervise her, Plaintiff alleges that Ms. Santillanes was spending her energies on the City's tricentennial project.  She also alleged that Ms. Gore failed to support or assist her in creating an appropriate working environment at the warehouse.  She alleged that Ms. Santillanes evicted her from the warehouse and subsequently locked Plaintiff out of her office at City Hall.  According to Plaintiff's grievance, after Ms. Santillanes informed her of her transfer and the investigation, she had a Human

Resource officer take possession of Plaintiff's computer and supervise Plaintiff as she removed her personal items from her office.  Plaintiff complained in her grievance that the resources of Cultural Services were being compromised for Ms. Santillanes' personal agenda.

Plaintiff never returned to work after September 2, 2004 when she was informed of her transfer and the investigation.  On September 3, 2004, Plaintiff informed the City that she was ill with "a particularly virulent form of flu."  On September 15, Ms. Santillanes sent Plaintiff a letter informing her that her sick leave was exhausted on September 8, 2004 and that no leave without pay had been requested or authorized.  Ms. Santillanes requested that Plaintiff return to work reporting at the Bio Park.

The City has a Family and Medical Leave policy in the City's Personnel Rules and Regulations.  They provide in relevant part:

> These rules and regulations are based on the provisions of the federal Family and Medical Leave Act (FMLA) and will be administered consistent with that law, federal regulations and the definitions included in this section.
>
> Job-protected leave may be taken for up to a total of twelve (12) workweeks in any twelve (12) month period because of  . . . (4) the employee's inability to work because of a serious health condition.
> . . .
> A.  Eligibility
>
> To be eligible for FMLA leave, an employee must have worked for the City twelve (12) months (or fifty-two 52 weeks if the work is intermittent) and must have worked 1,250 hours in the twelve (12) months preceding the date the FMLA leave will begin.  FLSA-exempt employees who have worked for twelve (12) months are presumed to meet the hourly requirement.  Paid and upaid adsences used in the twelve (12) months preceding the date the FMLA leave will begin will not be counted toward the 1,250 hour total.
> . . .
> D.  Notice Requirements
>
> 1.  Employee Notice of Leave

As with any type of leave, an employee must give advance notice requesting leave and obtain approval, except in emergencies.  An employee must give at least thirty (30) days written notice before leave starts.  If thirty (30) days notice is not possible, notice is expected as soon as practical.  "As soon as practical" means at least verbal notice within two (2) business days of learning of the need for leave followed by written confirmation.  If an employee fails to give thirty (30) days notice for foreseeable leave with no reasonable excuse for the delay, the department director may deny the taking of leave until at least thirty (30) days after the date the employee provided notice.

Request for leave must be submitted on a Request for Leave of Absence form.  The department director or designee will determine if the leave qualifies for family/medical leave.  It is the employee's responsibility to provide enough information, including the reason for requesting leave, so that the department director can make this determination.

Any FMLA-qualifying absence will be designated as FMLA leave by the department director and will be applied to the twelve (12) weeks entitlement, even if not requested by the employee.

2.  City Notices to the Employee

. . .

The department director will also within two (2) workdays, if feasible, notify the employee of the designation of the absence as FMLA even if the employee had not requested such leave.  If the department director learns the absence is for an FMLA qualifying purpose the director may retroactively designate the leave as FMLA leave.  The department director will give notice within two (2) workdays, if feasible, of learning the reason for the leave.

The City may make a preliminary designation of leave as FMLA qualifying if medical certification was not provided prior to the beginning of leave, or if the employer is waiting for a second or third medical opinion.

The City may designate leave, which has already been taken.

E.  Required Medical Certification

An employee who requests leave for their own or an eligible family member's serious health condition must provide a medical certification from a health care provider on a form supplied by the City.  Where FMLA leave is foreseeable and thirty (30) days notice has been provided, an employee must provide a medical certification before leave begins.  In other cases, the medical certification must be

provided within fifteen (15) days after the City requests medical certification or the employee advised their supervisor of the need for the FMLA absence. . . .

. . .

The City may request additional medical certificates at reasonable intervals during family/medical leave, but no more often than every thirty (30) days, unless the reason for or duration of the leave changes.

. . .

G.  Substitution of Paid Leave

1.  Employees must use accrued sick leave.  After accrued sick leave is exhausted, the employee may use vacation or unpaid leave. . . .

. . .

H.  Rights and Responsibilities While on Leave

. . .

While on FMLA leave, an employee must contact the supervisor, by telephone, at least every four (4) weeks to report on their status and intention to return to work at the end of the leave.  If the circumstances of the employee's leave changes and the employee is able to return to work earlier than anticipated, the employee must notify the supervisor at least two (2) workdays before the date the employee intends to report to work.

I.  Return to Work after FMLA

1.  Position

a.  An employee, except for a key employee, returning from FMLA, has the right to return to their former position if the employee is able to perform the essential functions of the job, or they may be placed in an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

. . .

2.  Benefits

 . . . An employee shall provide certification from the health care provider supporting a claim of inability to return to work for health reasons.

Exhibit K to Defendants' Motion for Summary Judgment (City of Albuquerque Personnel Rules and Regulations Section 401.11 - Family and Medical Leave).

On September 28, 2004, Plaintiff's treating psychologist Dr. Glass provided a City of Albuquerque FMLA leave certification form indicating that Plaintiff was unable to work from

16

September 9, 2004 through October 10, 2004.  On October 18, 2004, Patricia Miller, Director of

Human Resources for the City, sent Plaintiff an e-mail notifying her that her time away from work

appeared to qualify for FMLA leave for the period from September 11 through October 9, but

that a doctor's certification was necessary to continue on FMLA leave for the time period after

October 9.  Ms. Miller notified Plaintiff that a certification was required by October 28 or the

leave taken after October 9 would be designated as unauthorized leave without pay.

Plaintiff did not submit any further documentation or medical certification for FMLA leave

in response to Ms. Miller's October 18 e-mail.  However, Plaintiff did continue to submit

documents requesting that she be carried on leave without pay status.  At the time, Plaintiff was

represented by counsel.  A copy of Ms. Miller's October 18 e-mail was provided to both

Plaintiff's attorney and Plaintiff's physician.

On December 3, 2004, Plaintiff was given notice of a pre-determination hearing.  The

notice indicated that Plaintiff was being charged with violating city policy by being absent from

work without authorized leave and by failing to provide the required medical certification to

continue on FMLA.  The notice also indicated that disciplinary action including termination might

result if the charges were found to be true at the hearing.  On December 8, 2004, Plaintiff was

given notice of a pre-determination hearing indicating she was being charged with violating city

policies by authorizing the construction of walls in the warehouse.

On December 14, 2004, the pre-determination hearing was held pursuant to both notices.

Plaintiff attended the hearing with counsel to respond to the charges.  Plaintiff was permitted to

say anything she wanted at the hearing.  She was also permitted to submit additional information

after the hearing.  No witnesses were presented by the City during the hearing and there were no

provisions for the examination or cross-examination of witnesses. Thus, the hearing was a review of written documentation and Plaintiff's verbal response to the charges.

On December 16, 2004, Plaintiff's physician, Dr. Shaffer, sent a letter to the City, the body of which stated:

> This letter is to state that Mrs. Barbara Jean Nierengarten-Smith has been away from work since early September due to mental and multiple physical conditions. It is not known at this time when she will be able to return to work. Please call if you have any questions or if I may be of further assistance.

Exhibit 2 to Exhibit M of Defendants' Motion for Summary Judgment. No additional FMLA certification was provided by Dr. Shaffer. Plaintiff has testified that she has been unable to work since at least January 2005.

On January 4, 2005, Ms. Santillanes sent Plaintiff a Notice of Final Action (NFA) with the hearing officer's findings and recommendations attached. The hearing officer found that Plaintiff had been insubordinate and uncooperative and had violated County building regulations by constructing the walls in the warehouse. The hearing officer also found that Plaintiff had been absent without authorized leave and had failed to provide the required medical certification for FMLA. The hearing officer recommended Plaintiff be terminated. The NFA adopted the hearing officer's findings and recommendations and notified Plaintiff that her employment with the City was terminated effective January 4, 2005 at 5:00 p.m. The NFA informed Plaintiff that she had a right to appeal the decision in accordance with the City of Albuquerque Merit System Ordinance.

Plaintiff did not appeal her termination. Plaintiff contends that she had a variety of reasons for not appealing the termination including an October 2003 audit report on the merit system ordinance. This audit noted that, in 2002, there was no operating Personnel Board to hear

18

appeals, there were 21 appeals pending, and the potential liability of the City for back pay if the appeals were determined favorably to the appellants were growing.  As of June 2003, four of the five positions was filled, and a quorum of four members was sufficient to make decisions.  At the time of Plaintiff's termination, all five positions on the Personnel Board were filled.  At a post-termination appeal, an employee has the right to counsel, the right to conduct discovery, the right to confront and cross examine witnesses, the right to present evidence, the right to compel witnesses, and the right to submit oral and written argument.

At some point in time after Plaintiff's termination, Ms. Santillanes and Ms. Gore attended a Board meeting and reported that Plaintiff had been discharged because of an investigation that had determined wrongdoing.

Defendants filed the instant motion for summary judgment arguing that the individual Defendants are entitled to qualified immunity with regard to Plaintiff's Due Process and First Amendment claims under 42 U.S.C. § 1983.  Defendants contend that Plaintiff cannot prove her claim of breach of contract because, even construing all the evidence favorably to Plaintiff, there is no evidence the City violated any of the rules cited by Plaintiff.  Defendants argue that Plaintiff cannot prove her procedural Due Process claim because she had no protected property interest and was not denied procedural due process.  With regard to Plaintiff's substantive due process claim, Defendants urge that Plaintiff's evidence does not show that any Defendant made a statement that implicated Plaintiff's liberty interest in her good name or reputation.  Defendants assert that they are entitled to summary judgment on Plaintiff's claim under the FMLA because Plaintiff never sought leave under the FMLA, because Plaintiff did not provide FMLA certification for any leave after October 9, 2004, and because Plaintiff was provided more than

twelve weeks of FMLA which is all that is required.  Additionally, Defendants argue that individual Defendants are not liable under the FMLA or are entitled to qualified immunity for the FMLA claim.  With regard to Plaintiff's First Amendment retaliation claim, Defendants contend that Plaintiff did not engage in protected speech, that any protected speech was too remote in time from any adverse employment action, that there was no adverse employment action, and that Defendants would have taken the same action anyway.  Defendants urge that the City is entitled to summary judgment on Counts Two, Four and Five because Plaintiff cannot show a municipal policy or custom that was carried out by an official with final policy making authority with respect to the alleged constitutional violations.

In response to the motion for summary judgment, Plaintiff disputes Defendants' asserted undisputed material facts, objects to some of Defendants' evidence, asserts that Defendants' motion is actually argued under the standards for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), argues the merits of her motion to compel filed previously in this case (Doc. 62), and argues that Defendants are not entitled to summary judgment.  In their reply brief, Defendants attack much of Plaintiff's evidence, respond to Plaintiff's attacks of their evidence, and argue again for summary judgment.  The Court will address the merits of the summary judgment motion as well as the evidentiary issues in the order in which they are most logically addressed.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d

664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of

persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the

Court that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp.

v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671.  The nonmoving party must then

go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial

sufficient to support a verdict for the nonmovant.  Anderson v Liberty Lobby, Inc., 477 U.S. 242,

248-49 (1986).  The nonmovant must establish, at a minimum, an inference of the presence of

each element essential to the case.  Bausman v Interstate Brands Corp., 252 F.3d 1111, 1115

(10th cir. 2001).  In setting forth facts, the nonmoving party need not present evidence in a form

admissible at trial, but the content or substance of the evidence must be admissible.  Adams v.

American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000).  Hearsay

testimony cannot be considered.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir.

1995); Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  Additionally, only

statements in an affidavit based on personal knowledge may be considered, and statements made

on information and belief may not be considered.  Tavery v. U.S., 32 F.3d 1423, 1427 n.4 (10th

Cir. 1994) (Under Fed.R.Civ.P. 56(e), only statements "made on personal knowledge" will

support a motion for summary judgment; statements of mere belief must be disregarded).

    In ruling on a motion for summary judgment, a Court does not weigh the evidence, but

determines whether the evidence presents a sufficient disagreement to require submission to a jury

or whether it is so one-sided that one party must prevail as a matter of law.  Jeffries v. State of

Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998).  In making this determination, the Court must

construe all the facts in the record and reasonable inferences that can be drawn from those facts in

a light most favorable to the nonmoving party.  Worrell, 219 F.3d at 1204.  However, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record. Cross v. The Home Depot, 390 F.3d 1283, 1290 (10th Cir. 2004) (citing Downes v. Beach, 587 F.2d 469, 472 (10th Cir. 1978) and Mitchell v. City of Moore, 218 F.3d 1190, 1199 (10th Cir. 2000) ("The district court was not obligated to comb the record in order to make [the plaintiff's] arguments for him.")).

**DISCUSSION**

I.    PLAINTIFF'S CLAIMS AGAINST DEFENDANT JAMES MOORE

In her response to Defendants' Motion for Summary Judgment, Plaintiff states that she is abandoning her claims against Defendant Moore based on her lack of evidence to support her claims against him.  While Plaintiff also indicates she may wish to resurrect claims against Defendant Moore in the future if she obtains additional evidence, this is summary judgment, and Plaintiff must either come forward with evidence to support her claims or have judgment entered on behalf of a Defendant.  Plaintiff has not submitted a Rule 56(f) affidavit with regard to her claims against Defendant Moore.  While Plaintiff indicates that she may obtain information after the Court rules on a motion to compel pending at the time her response was filed, the Court notes that the motion to compel has been denied.  See Memorandum Opinion and Order Denying Plaintiff's Motion to Compel filed April 10, 2006 (Doc. 77).  Accordingly, the Court will enter judgment on behalf of Defendant Moore.

II.   EVIDENTIARY ISSUES RAISED BY THE PARTIES

Plaintiff's response argues that much of the evidence submitted by Defendants in support of summary judgment is inadmissible.  Plaintiff's statements of law regarding the evidence that may be considered at the summary judgment stage are correct.  I conclude, however, that Plaintiff is incorrect in many of her assertions that particular evidence is inadmissible.  Much of what Plaintiff calls hearsay is obviously not offered for the truth and much of it is documentation that speaks for itself.  The one exhibit that I will not consider is Exhibit 13 attached to Exhibit F of Defendant's Motion for Summary Judgment.  Nothing on the face of this document is self-authenticating, there is no affidavit supporting its authenticity, and Plaintiff challenges its authenticity.

Plaintiff's response also urges that many of Defendants' factual contentions are not material.  I have carefully sifted through Defendants' facts and Plaintiff's responses to those facts and find that both sides have offered much that is immaterial and irrelevant.  I have ignored irrelelvant and immaterial facts in giving the background of this case.

Defendants attack much of Plaintiff's evidence in their Reply.  First, Defendants attack Plaintiff's affidavit to the extent it is based on "information and believe" rather than personal knowledge.  They also attack Plaintiff's legal interpretations and her speculations.  Defendants are correct that an affidavit must be based on personal knowledge and not on "information and belief."  Defendants are also correct that Plaintiff is not qualified to attest to her legal interpretations or opinions in an affidavit.  Additionally, to the extent Plaintiff speculates that certain events were caused by others, these are also not facts within Plaintiff's personal knowledge.  The Court will ignore those portions of Plaintiff's affidavit that are obviously not based on her personal knowledge.

Defendants attack Exhibits 5, 33, 51, and 26 on the basis that they are unverified.  The Court does not find these exhibits so questionable that they should be ignored.  E-mails, photographs, and city ordinances can be easily authenticated at a later date.  Thus, the Court will consider these exhibits for what they are worth, though the relevance of some of them is questionable.

Defendants also attack Exhibits 15, 20, 24, 25, and 50 on the basis they are unverified.  It is unclear why Plaintiff has offered Exhibit 15.  To the extent it is an email, its lack of authentication does not call it into question at this stage of litigation.  However, Plaintiff seems to be offering this exhibit to show that there are items that were placed in her personnel file after her termination.  There is nothing about Exhibit 15 indicating it was ever placed in Plaintiff's personnel file -- it appears to be a draft of a written reprimand that was contemplated but never executed by Ms. Santillanes.  To that extent, it is irrelevant.  Contemplated personnel actions that are never taken cannot form the basis of any cause of action.  Exhibit 20 is identical to Defendant's Exhibit 13 attached to Exhibit F.  It is difficult to understand why Plaintiff has offered as an exhibit a document to which she has objected.  In any case, the Court has already determined that this document will not be considered.

Exhibits 24 and 25 are transcriptions of interviews taken during a City investigation.  There is nothing indicating that these interviews were taken under oath.  Accordingly, they are hearsay and will not be considered.  Similarly, Exhibit 50 appears to be Plaintiff's intended testimony at her pre-determination hearing.  There is no indication that this was her actual testimony or that this was given under oath.  Because it is offered by Plaintiff, it is hearsay.

III.   PLAINTIFF'S ALLEGATION THAT DEFENDANTS HAVE ATTACKED THE
       SUFFICIENCY OF HER COMPLAINT UNDER FED. R. CIV. P. 12(b)(6).

       At pages 20 through 21 of their motion for summary judgment, Defendants list the claims

brought in Plaintiff's Complaint and introduce the grounds upon which they seek summary

judgment for each claim.  The motion then proceeds to argue these grounds in detail.  Nothing in

the motion suggests that the Court should dismiss any of these claims for failure to state a claim

without reviewing the evidence submitted by Plaintiff in support of the claims.  Thus, Plaintiff is

incorrect in asserting that Defendants have made their motion pursuant to Rule 12(b)(6) rather

than Rule 56 of the Federal Rules of Civil Procedure.  Additionally, Defendants titled their motion

as one made for summary judgment under Rule 56 and Plaintiff submitted evidence in opposition

for summary judgment.  Thus, Plaintiff had notice the motion was made pursuant to Rule 56, and

the Court will proceed to rule on the motion using the summary judgment standard.  See Fed. R.

Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the

pleading to state a claim upon which relief can be granted, matters outside the pleading are

presented to and not excluded by the court, the motion shall be treated as one for summary

judgment).

IV.   PLAINTIFF'S BREACH OF CONTRACT CLAIM

       Plaintiff alleged a claim of breach of contract in Count One of her Complaint.  Specifically,

she alleged that she was entitled to the protections of the City's Personnel rules and regulations,

that pursuant to these rules, she was subject to discharge only for good cause, and that she was

discharged without good cause.  In her responses to interrogatories, Plaintiff alleged a much

broader basis for her breach of contract claim and asserted that Defendants had breached a

25

contract by violating several provisions of the City personnel rules including the rule for disciplinary procedures, the rule prohibiting retaliation against employees for filing grievances, the rule for grievance procedures, and the rules governing leave including those for family medical leave.

To establish a claim for breach of contract, Plaintiff must show first that a contract existed between the parties and that the contract governed the conduct about which she complains. New Mexico will recognize a contractual relationship between the parties where an employer has made a promise sufficient to support an implied contract. Lopez v. Lawrence Kline and Herbert M. Denish and Assoc., 953 P.2d 304 (N.M. App. 1997).

Defendants' first argument for summary judgment on Plaintiff's breach of contract claim contends that Plaintiff cannot show that any of the various rules on which she relies give rise to an implied contract. In response, Plaintiff states that her facts presented in exhibits 1 through 52 support her claim. Plaintiff also states that her responses to Defendants' interrogatories in exhibit 46 describes claims for breach of contract not addressed by Defendants in the motion for summary judgment, and that the evidence in exhibits 1 through 50 provides sufficient facts to support her claim.

A motion for summary judgment does not give rise to a shell game. Plaintiff cannot continue to shift her claim while asking the Court to guess which of her exhibits contains the factual support for the claim. Plaintiff submitted fifty-two exhibits in opposition to Defendants' motion. Plaintiff references all of these exhibits and informs the Court that, somewhere within these exhibits are facts to support her claim. The Court has no obligation to comb through this record to find the facts to support Plaintiff's claim and make legal arguments based on those facts.

<u>Cross</u>, 390 F.3d at 1290.  Plaintiff, as the party responding to summary judgment who bears the burden of proof on the claims at trial, bears the burden at the summary judgment stage of pointing to specific facts showing a dispute for trial with regard to each element of her claim.  <u>See</u> <u>Bausman</u>, 252 F.3d at 1115 (nonmovant must establish an inference with regard to each element of a claim); <u>see also</u>, <u>Cross</u>, 390 F.3d at 1290 (nonmovant must portray factual dispute with particularity).  Plaintiff has failed to meet her burden, and Defendants are accordingly entitled to summary judgment on the Breach of Contract claim in Count One.

V.     PLAINTIFF'S PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAIMS IN COUNT TWO

In addition to attacking the merits of Plaintiff's claims in Count Two with regard to all Defendants, the individual Defendants also assert that they are entitled to qualified immunity with regard to these claims.  In analyzing whether a defendant is entitled to qualified immunity, the Court must first decide whether the Plaintiff has shown a constitutional violation, and only then proceed to determine whether the law was clearly established.  <u>Roska ex rel. Roska v. Peterson</u>, 328 F.3d 1230 (10th Cir.2003) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  If the Court determines that a plaintiff has failed to show the violation of a constitutional right, the Court need not reach the question of whether the law was clearly established or whether individual defendants are entitled to qualified immunity.  <u>Christiansen v. City of Tulsa</u>, 332 F.3d 1270, 1278 (10th Cir. 2003); <u>Lighton v. University of Utah</u>, 209 F.3d 1213, 1221 (10th Cir.2000).

A.     <u>Plaintiff's Procedural Due Process Claims</u>

1.     <u>Property Interest</u>

In order to survive a motion for summary judgment with regard to her procedural due process claim, Plaintiff must show that she has a property interest protected by due process and that she was not afforded an appropriate level of process when she was deprived of the protected property interest.  Montgomery v. The City of Ardmore, 365 F.3d 926, 935 (10th Cir. 2004) (citing Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996)).

Defendants contend that Plaintiff was not deprived of protected property interest when she was transferred to the Bio Park.  Plaintiff's response brief does not offer argument on this point. Generally, "no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary."  Hulen v. Yates, 322 F.3d 1229, 1240-1241 (10th Cir. 2003).  Because Plaintiff has offered no evidence or argument that a specific statutory provision or contract term prohibited her transfer from the Balloon Museum to the Bio Park, she has failed to show that a property interest was implicated by this transfer and it cannot form the basis of a procedural due process claim.

Defendants read Plaintiff's Complaint as alleging that she was denied sick leave in violation of her procedural due process rights and argue that she had no protected property interest in accrual of sick leave during her unpaid leave.  Plaintiff, again, does not offer argument on this point in her response brief.  In any event, the City Personnel Rules and Regulations (PRR) are clear that an employee does not accrue sick and annual leave during any period of unpaid FMLA leave.  See PRR § 401.11(H) in Exhibit K to Defendants' Motion for Summary Judgment.

The Court reads Plaintiff's Complaint as alleging that she was denied sick leave without pay without due process.  First, the Court notes that Plaintiff was absent from work from September 2 through the date of her termination on January 4, 2004.  She had exhausted her sick

28

leave by September 8, 2004 so was on unpaid leave from that date until January 4, over sixteen weeks.  This is more than is required under the FMLA.  In her response to Defendants' statement of material facts, Plaintiff stated that she was entitled to up to six months of unpaid leave under PRR § 402.5.  This provision states that a City employee may be granted an unpaid leave of absence of up to six months under certain conditions and specifies that a leave of absence will only be granted if the department director certifies the department can continue to provide the required services during the employee's absence.  See PRR § 402.5 in Exhibit K to Defendants' Motion for Summary Judgment.  "The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit."  Town of Castle Rock, Colo. v. Gonzales, 125 S.Ct. 2796, 2803 (2005).  To have a property interest in a benefit, a person must have a legitimate claim of entitlement to it.  Id.  "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  Id.  The leave of absence provision in PRR § 402.5 is clearly discretionary and does not create a property interest protected by the Due Process clause.  Accordingly, denial of this leave cannot form the basis of a due process claim.

Plaintiff alleges that she was deprived of due process when the City refused her requests for information regarding the investigation of which she was notified on September 2, 2003. Defendants contend Plaintiff had no property interest in the information, and that the giving of information was not required procedurally before Plaintiff's transfer to the Bio Park because Plaintiff had no protected property interest in remaining at the Balloon Museum.  As noted above, Plaintiff's transfer to the Bio Park did not implicate a property interest.  Plaintiff has pointed out

no source giving her an entitlement to the information.  Accordingly, she had no protected property interest in being given the information.

Plaintiff also alleges that she was deprived of her property interest in her employment without due process because she was not given information she requested about the investigation, and because she was not permitted to confront the witnesses and evidence against her in her pre-determination hearing.  Defendants, assuming Plaintiff had a protected property interest in her employment, contend that Plaintiff was not denied adequate pre-deprivation procedures because she was permitted an opportunity to be represented by counsel and respond to the reasons for her proposed termination.  They also point out that Plaintiff did not avail herself of her post-termination procedural remedies.  Plaintiff responds that the post-termination remedies were not adequate because the procedures outlined in the Personnel Board Rules, see Exhibit B to Exhibit O to Defendants' Motion for Summary Judgment, which provide for discovery and the calling of witnesses were adopted in 1993 and superceded by PRR § 904.1, see Exhibit K to Defendants' Motion for Summary Judgment, which were updated in 2001.  She also argues that the post-termination proceedings were inadequate based on internal audit report from October 2003.

"An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  "This process requires some kind of hearing prior to the discharge of an employee who has a constitutionally protected property interest in [her] employment."  Id.  However, a pretermination hearing need not be elaborate.  Id. at 545.  Something less than a full evidentiary hearing is sufficient.  Id.  The employee is entitled to oral or written notice of the charges against her, an explanation of the employer's evidence,

and an opportunity to present in person or in writing her side of the story and reasons the proposed action should not be taken.  Id. at 546.  This is all that is required when there are adequate post-termination procedures available.  Id.; Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998).

The Court notes that Plaintiff did not avail herself of any post-termination procedures, so the Court's analysis must necessarily be limited to the procedures theoretically available under relevant City policies rather than an analysis of procedures actually provided.  The Personnel Board Rules provide that a party to post-termination proceedings will have a right to counsel, the right to conduct discovery, the right to compel witnesses, the right to confront and cross examine itnesses, the right to present evidence, and the right to submit oral and written argument. Plaintiff's argument that the Personnel Board Rules were superceded by PRR § 904.1 lacks merit. While she is correct that the Personnel Board Rules expressly state that they are not intended to supercede the PRR, the Rules make clear that the PRR controls over the Personnel Board Rules only when there is a conflict or inconsistency between the Rules and the PRR.  There is no conflict or inconsistency between the Personnel Board Rules and PRR § 904.1.  Thus, the procedures outlined in the Rules were available to Plaintiff in a post-termination proceeding. These procedures are more than adequate to satisfy due process.

Plaintiff's argument that any post-termination proceeding would have been inadequate because of the internal audit report from October 2003 is speculative.  First, the internal audit report identified systemic concerns affecting post-termination proceedings but did not find that post-termination proceedings were inadequate.  Additionally, it cannot be said that conditions existing when the internal audit took place even existed when the final report was released much

31

less that these conditions existed in January 2004.  Plaintiff places much emphasis on the alleged shortage of Personnel Board members detailed in the internal audit report.  Defendants have provided competent evidence that, at the time of Plaintiff's termination, all Personnel Board positions were filled.

Based on the above analysis, Plaintiff has not provided sufficient evidence to support any of the procedural due process violations she has alleged with regard to any property interest. Having concluded that Plaintiff has failed to show a violation of her constitutional rights, the Court need not address whether the law was clearly established to determine whether individual defendants are entitled to qualified immunity.  All Defendants are entitled to summary judgment on Plaintiff's claim in Count Two that she was deprived of property without due process.

2.   <u>Liberty Interest</u>

Plaintiff's complaint alleges a deprivation of her liberty interest in her good reputation and opinion.  Defendants characterize this as a substantive due process claim.  However, case law makes it clear that this is a procedural due process claim.  <u>See e.g.</u>, <u>Stidham v. Peace Officer Standards and Training</u>, 265 F.3d 1144 (10th Cir. 2001); <u>Workman v. Jordan</u>, 32 F.3d 475, 480-81 (10th Cir. 1994) (once a liberty interest is implicated, a plaintiff must show he was not afforded an adequate name-clearing hearing).  An individual's reputation is a protected liberty interest, but a plaintiff alleging a deprivation of this interest in violation of due process is required to show that her reputation was damaged in connection with an adverse action taken against her. <u>Id.</u> at 1153.  "In other words, defamation, standing alone, is not sufficient to establish a claim for deprivation of a liberty interest." <u>Id.</u> (internal citation and quotation omitted).  Assuming a

32

negative statement regarding a plaintiff was made, a four part test is used to determine whether

the statement infringes upon a liberty interest as it affects a property interest in employment.  Id.

>First, to be actionable, the statements must impugn the good name, reputation,
>honor, or integrity of the employee.  Second, the statements must be false.  Third,
>the statements must occur in the course of terminating the employee or must
>foreclose other employment opportunities.  And Fourth, the statements must be
>published.

Id.

For a statement to be found to impugn the good name, reputation, honor, or integrity of

the employee, the statement must involve a "false charge of sufficient opprobrium that would

make the plaintiff an unlikely candidate for employment."  Garcia v. City of Albuquerque, 232

F.3d 760, 772 (10th Cir. 2000).  "Such statements involve charges of dishonesty or immorality."

Id.  Examples of the types of accusations that would be sufficiently opprobrious include

accusations of dishonesty or serious felony.  Id. (citing Melton v. City of Okla. City, 928 F.2d

920, 927 (10th Cir. 1991)) The statement must have the potential to cause stigma by reflecting on

the person's character.  Id. (citing Hill v. Dep't of Air Force, 844 F.2d 1407, 1412 (10th Cir.

1988)).  Accusations that an employee has failed to schedule leave or has difficulty being on time

are not statements that call into question an employee's good name, reputation, honor and

integrity.  Sipes v. United States, 744 F.2d 1418, 1422 (10th Cir. 1984).

In this case, Plaintiff alleges that Ms. Santillanes' statement in her August 25, 2004 letter

to the Foundation president deprived her of her liberty interest in her good name and reputation.

She also alleges that she was deprived of this liberty interest when Ms. Santillanes and Ms. Gore,

after Plaintiff's termination, reported to the Board that Plaintiff had been discharged because of an

investigation that had determined wrongdoing.  The statements in Ms. Santillanes' August 25

33

letter are not sufficiently stigmatizing to give rise to a deprivation of Plaintiff's liberty interest. While Ms. Santillanes did state that Plaintiff had broken the law, the letter as a whole made clear that Plaintiff's alleged illegal conduct was a violation of City and County building codes. Thus, Ms. Santillanes did not accuse Plaintiff of a serious felony or otherwise call Plaintiff's integrity or morality into question.

The statement that Plaintiff had been terminated for "wrongdoing" is also not sufficiently stigmatizing to support Plaintiff's liberty interest claim. Wrongdoing could encompass any type of employment issue including issues involving use of leave and attendance. "Wrongdoing" is too vague a term to be called a charge of dishonesty or immorality.        Even if the statement regarding wrongdoing were sufficiently stigmatizing, there is no evidence that this statement was made in the course of Plaintiff's termination. The Tenth Circuit noted in Stidham that the Supreme Court decision in Siegert. v. Gilley, 500 U.S. 226 (1991), calls into question the continued availability of a claim based on the foreclosure of other employment opportunities. Stidham, 265 F.3d at 1154. In any event, there is no evidence that the statement foreclosed other employment opportunities for Plaintiff.[8]

Even if Plaintiff's evidence created a disputed issue of material fact with regard to whether the statements infringed Plaintiff's liberty interest, Plaintiff has offered no evidence regarding procedural protections denied with regard to the deprivation of any liberty interest. See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1558 (10th Cir. 1993) ("Once a liberty interest is implicated, the due process protections of the Fourteenth Amendment are activated and

_____

[8]Plaintiff made no argument in her response brief on this issue, and confined her argument to whether the statements were defamatory and whether they were false.

plaintiffs must show that they were not afforded an adequate hearing."). Because Plaintiff has failed to show a violation of her constitutional rights, the Court does not reach the issue whether the law was clearly established to determine whether individual defendants are entitled to qualified immunity. All Defendants are entitled to summary judgment on Plaintiff's claim in Count Two that she was deprived of liberty without due process.

      B.     <u>Plaintiff's Substantive Due Process Claim</u>

     "Only government conduct that shocks the conscience can give rise to a substantive due process claim." <u>Perez v. Unified Government of Wyandotte County/Kansas City, Kan.</u>, 432 F.3d 1163, 1166 (10th Cir. 2005) (citing <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 848 (1998)). Plaintiff's Complaint alleges that Defendants violated her substantive due process rights by arbitrarily, capriciously and maliciously depriving her of her employment. However, this claim does not appear in the Amended PreTrial Order. The pretrial order supercedes the pleadings in the case, and any claim not included in the pretrial order is waived or abandoned. <u>See</u> <u>Harvey Barnett, Inc. v. Shidler</u>, 338 F.3d 1125, 1132 n.10 (10th Cir. 2003).

     Even if the claim had not been abandoned, the Court notes that Circuit precedent has not made clear what property interests in employment are fundamental and thus protected by substantive due process. <u>See</u> <u>Clinger v. New Mexico Highlands University, Bd. of Regents</u>, 215 F.3d 1162, 1167 (10th Cir. 2000) (citing <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249, 1257 (10th Cir.1998)). Assuming that substantive due process protections apply, there is no evidence in the record that Plaintiff's termination was either arbitrary or capricious. To support a substantive due process claim, it is not enough for Plaintiff to show that her termination was ill-advised or even incorrect. <u>Curtis v. Oklahoma City Public Schools Bd. of Educ.</u>, 147 F.3d 1200,

1215 (10th Cir. 1998) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions").  Plaintiff would be required to show that her termination was irrational, i.e., that she was terminated for no reason.  Id.  The evidence of record suggests otherwise.  Again, the Court has determined that Plaintiff failed to show the violation of a constitutional right and need not inquire whether the right was clearly established to determine that individual Defendants are entitled to qualified immunity.  All Defendants are entitled to summary judgment on Plaintiff's substantive due process claim in Count Two.

VI.   PLAINTIFF'S CLAIM FOR VIOLATION OF THE FAMILY AND MEDICAL LEAVE
      ACT (FMLA).

      The FMLA makes it unlawful for any covered employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." 29 U.S.C. § 2615(a)(1). To make out a prima facie claim for FMLA interference, a plaintiff must establish (1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights.  Jones v. Denver Public Schools, 427 F.3d 1315, 1318-19 (10th Cir. 2005).  The FMLA entitles a qualified employee to up to twelve weeks of leave during any twelve month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id. at 1319 (citing 29 U.S.C. § 2612(a)(1)(D)).

      Defendants first argue that the individual defendants are not subject to liability under the FMLA, and, even if there is individual liability, the individual defendants are entitled to qualified

immunity.  With regard to the merits of Plaintiff's FMLA claim, Defendants contend that they are

entitled to summary judgment on Plaintiff's FMLA claim because Plaintiff did not seek and did

not want FMLA benefits and because Plaintiff received full FMLA benefits.  Plaintiff's response

makes no argument with regard to her FMLA claim other than to state that the Court should deny

the individual Defendants qualified immunity.  Because Plaintiff has made no attempt to meet her

burden of pointing to specific facts showing a dispute for trial with regard to each element of her

FMLA claim, the Court could conclude that Defendants are entitled to summary judgment on this

claim without further analysis.  However, the Court will note that it is undisputed that Plaintiff

was employed until January 4, 2005, that she did not work from September 2, 2004 until the date

of her termination, and that she was on unpaid leave after September 8, 2004, more than sixteen

weeks.  It is also undisputed that the City designated Plaintiff's leave as FMLA leave in spite of

Plaintiff failing to timely give notice of leave or provide requested certification of her ongoing

need for leave after October 9, 2004, the date her initial certification indicated was the date she

could return to work.  Defendants had no obligation to continue Plaintiff on unpaid leave beyond

twelve weeks under the FMLA.  Thus, Plaintiff received all that she was entitled to receive under

the FMLA and has failed to show any violation of the FMLA.  Accordingly, Defendants are

entitled to summary judgment with regard to Plaintiff's FMLA claim in Count Three.

VII.   PLAINTIFF'S CLAIM FOR VIOLATION OF HER FIRST AMENDMENT RIGHT OF
       FREE SPEECH.

       A First Amendment retaliation claim is evaluated using a well-established four part inquiry

in which (1) the Court determines whether the Plaintiff's speech involves a matter of public

concern; and, if so (2) the Court balances the Plaintiff's interest in commenting on matters of

public concern against the interests of the Defendants, as employers, in promoting the efficiency of the public services it performs through its employees; then, if the balance tips in favor of the Plaintiff (3) the Plaintiff must show that the speech was a substantial or motivating factor in a detrimental employment decision; then, if the Plaintiff establishes that the speech was a factor, (4) the Defendants may demonstrate that they would have taken the same action with regard to Plaintiff even in the absence of the protected speech.  Finn V. New Mexico, 249 F.3d 1241, 1246 (10th Cir. 2001); Lybrook v. Farmington Municipal Schools Bd. of Educ., 232 F.3d 1334 (10th Cir. 2000).

"[A] public employee's statements on issues not of general public concern are unprotected by the First Amendment."  Wilson v. City of Littleton, 732 F.2d 765, 767 (10th Cir. 1984). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ."  Id. at 768 (citing Connick v. Myers, 461 U.S. 138 (1983)).  To be protected speech, an expression must sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government.  Id. at 768.  Speech which discloses evidence of corruption, impropriety, or other malfeasance on the part of public officials is speech on a matter of public concern.  Schuler v. City of Boulder, 189 F.3d 1304, 1308 (10th Cir. 1999).  Speech that seeks to expose improper operations of the government or questions the integrity of government officials is also speech on a matter of public concern.  Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988).  Additionally, First Amendment protection applies to protected speech even when a public employee communicates privately with her employer instead of expressing her views publicly.  Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413 (1979).  However, it is not sufficient that the subject matter of a public employee's speech be of

public concern; the actual content of the speech - what is actually communicated on the topic - must itself be of public concern.  <u>Wilson</u>, 732 F.2d at 769.

Plaintiff alleges she spoke out at a construction meeting in late 2003 or early 2004 questioning a change in the color of masonry that would result in an expenditure of funds.  In a letter written in January 2004, Plaintiff complained of a budget that left the Balloon Museum affiliated with the Albuquerque Museum rather than as an independent museum.  Plaintiff wrote a letter in March 2003 expressing concern that a new budget had cut out personnel positions for the balloon museum.  Upon being hired in 2002, Plaintiff questioned the balloon museum's merged budget with the Albuquerque Museum and wanted direct accountability for expenditures for the balloon museum.  In the summer of 2002, Plaintiff requested information about funds that were to be paid by the state to the balloon museum for parking at the Atomic Museum.  She made repeated requests for this information until her employment was terminated.  Within six months of being hired, Plaintiff complained about a shift of 3.2 million dollars from the budget for exhibits to the budget for the architect for expansion of the museum building.  Plaintiff learned that the architect had gone to school with the mayor. In 2002, Plaintiff requested records from Ms. Gore regarding expenditures on a $30,000 information desk in the entry of the balloon museum. Plaintiff learned the money had been taken in "clean up."[9]  According to Plaintiff she repeatedly asked for records of state and City contributions to the balloon museum and repeatedly asked Ms. Gore for accountability of building and capital improvement funds.

The evidence in this case and Plaintiff's argument give little detail on the content, form and context of the above speech.  There is no evidence showing that the content of any of this

---

[9]Nothing the record explains the meaning of this.

speech touched on a matter of public concern.  Her evidence concerning her speech regarding a

shared budget with the Albuquerque Museum and wanting direct accountability for the balloon

museum shows no content that sought to expose government waste; rather, the evidence suggests

that the content of this speech concerned issues of control of the balloon museum and Plaintiff's

desire to be the director of the museum instead of a manager working under the umbrella of the

Albuquerque Museum.  The same is true of her 2003 letter regarding the budget cuts of balloon

museum personnel.  The content and context of this speech was obviously targeted at Plaintiff's

desire to be the balloon museum director.  Nothing in the 2003 letter exposes government

corruption, impropriety or malfeasance.  Plaintiff's various requests for information and records

of funds and expenses is not speech on a matter of public concern.  A mere request for

information does not inform any issue.  The fact that Plaintiff learned that the architect went to

school with the mayor is not speech of any kind on her part because there is no evidence that she

communicated this information to anyone.

Plaintiff's alleged speech at the construction meeting in late 2003 or early 2004 in which

she questioned an expenditure for changing the color or masonry at the balloon museum was not

speech on a matter of public concern because there is not evidence that the content of the speech

informed any issue of public concern.  There is no evidence that she attempted to expose

wrongdoing of any kind.  Plaintiff's complaint about the shift of 3.2 million dollars from the

budget for exhibits to the architect was not speech on a matter of public concern because there is

no evidence that the content or context of this speech was of public concern.

Even if Plaintiff engaged in protected speech regarding the expenditure for the change of

the masonry color in later 2003 or early 2004 and regarding the 3.2 million dollars approximately

six months after she was hired in April 2002 and again in late 2003 or early 2004, Plaintiff's First

Amendment claim must fail.  The Court will assume, as have Defendants, that the balance of

interests tips in favor of Plaintiff.  Thus, the Court must next inquire whether there is sufficient

evidence to create a genuine issue of material fact with regard to whether Plaintiff's speech was a

substantial or motivating factor in a detrimental employment decision.

 "Implicit in the Pickering test is a requirement that the public employer have taken some

adverse employment action against the employee."  Belcher v. City of McAlester, Okla., 324 F.3d

1203, 1207 n.4 (10th Cir. 2003) cited in Baca v. Sklar, 398 F.3d 1210 (10th Cir. 2005).  Thus,

before the Court is able to ascertain whether Plaintiff's speech was a substantial or motivating

factor in a detrimental employment decision, it must determine the detrimental employment

decisions, or adverse employment actions, at issue.

 While the Tenth Circuit has never specified what actions constitute "adverse employment

actions" in the First Amendment context, it is clear that actions that will not support a Title VII

claim may be actionable under the First Amendment.  Baca, 398 F.3d at 1220.  Actions such as

transfers and terminations are adverse actions for purposes of a First Amendment retaliation

claim.  Maestas v. Segura, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005).  However, the Tenth

Circuit has never held that all negative actions by a public employer, no matter how trivial, are

sufficient to support a First Amendment retaliation claim.  Lybrook v. Farmington Mun. Sch. Bd.,

232 F.3d 1334, 1340 (10th Cir. 2000).

 Plaintiff alleges that her termination and transfer were retaliatory adverse actions.  Her

response to the motion for summary judgment also seems to argue that the proscription against

her attending the construction meetings and the reprimand she received for her behavior at the

construction meeting were retaliatory adverse actions. Plaintiff's termination and transfer are adverse employment actions sufficient to support a First Amendment retaliation claim. Her reprimand is also an adverse action sufficient to support the claim. However, Ms. Santillanes' decision not to allow Plaintiff to attend construction meetings is insufficient to demonstrate an adverse employment action for purposes of Plaintiff's First Amendment claim. Plaintiff's job responsibilities did not include any formal involvement in the construction project, so her exclusion from the construction meetings did not alter her employment in any manner.

Having determined that Plaintiff's reprimand, transfer and termination were adverse employment actions, the Court must now consider whether Plaintiff's speech was a substantial or motivating factor in these decisions. For this factor, Plaintiff bears the burden of showing causation and must produce some evidence linking the adverse employment actions to her speech. Maestas, 416 F.3d at 1188. "Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. Id. at 1189. On the other hand, evidence of a long delay between an employee's speech and the adverse action "tends to undermine any inference of retaliatory motive and weaken the causal link." Id. Also necessary to show a causal connection is some evidence that the person involved in the adverse employment action was aware of Plaintiff's protected speech. See e.g., Morris v. Lindau, 196 F.3d 102 (2nd Cir. 1999) (plaintiff failed to show First Amendment retaliation when she failed to present any evidence that officials knew about her alleged speech); Stagman v. Ryan, 176 F.3d 986 (7th Cir. 1999) (plaintiff failed to show his termination was in retaliation for union activities when there was no evidence his employer had any awareness of the union activities); Cabrol v. Town of Youngsville, 106 F.3d 101 (5th Cir.

1997) (town employee's termination was not in retaliation for discussions with town council when there was no evidence the person who terminated him was aware of the discussions).

Plaintiff's speech regarding the 3.2 million dollars occurred within six months of her April 2002 hiring; therefore it occurred no later than October 2002. Plaintiff's transfer occurred on September 2, 2004. Plaintiff's termination occurred on January 4, 2005. The time delay between Plaintiff's protected speech regarding the 3.2 million dollars and her transfer is nearly two years, and the delay between this speech and termination is well more than two years. This delay undermines any inference of a retaliatory motive and justifies no inference of causation. Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir.1997) (holding four-month lapse between protected activity and adverse action insufficient to justify inference of causation). Plaintiff's speech at the construction meeting occurred in late 2003 or early 2004, but no later than the February 4, 2004 memo from the Director of the City Department of Municipal Development, to Ms. Santillanes requesting that Plaintiff not attend any further construction meetings. This was at least seven months before Plaintiff's transfer and eleven months before her termination. Again, this delay justifies no inference of a causal link between the protected speech and these adverse employment actions.

Plaintiff did receive a reprimand on February 11, 2004 for her behavior at the construction meeting. Ms. Santillanes gave this reprimand after receiving the February 4, 2004 memo. The contents of this memo suggest that Plaintiff engaged in inappropriate behavior at the construction meetings, but makes no mention of any comments made by Plaintiff regarding expenditures for a change in masonry color. Thus, Ms. Santillanes would have no knowledge of Plaintiff's speech from this memo. There is no other evidence in the record to suggest that Ms. Santillanes was

43

aware that Plaintiff had expressed any concerns regarding the expenditure for a change in masonry color.  Accordingly, there is insufficient evidence that Plaintiff's speech regarding the expenditure was a substantial or motivating factor in Ms. Santillanes' decision to issue the reprimand.

Because Plaintiff has failed to provide sufficient evidence showing protected speech or to create a disputed issue of material fact with regard to a causal connection between her speech and any adverse employment action, she has failed to show a violation of her First Amendment right to free speech.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment claim in Count Five.

VIII.   PLAINTIFF'S CLAIM FOR MONELL LIABILITY IN COUNT FOUR

The Court has construed Plaintiff's claim in Count Four as a claim of municipal liability under 42 U.S.C. § 1983 for the constitutional violations alleged in Counts Two (due process) and Five (First Amendment).  For a claim of municipal liability, a plaintiff must prove that a municipal employee's unconstitutional conduct was representative of an official policy or custom or were carried out by an official with final policy making authority.  Canfield v. City of Oklahoma City, 248 F.3d 1214, 1229 (10th Cir. 2001).  Thus, as a threshold matter, there must be unconstitutional conduct by an individual employee to support the claim for municipal liability.  This Court has concluded that Plaintiff has failed to show a constitutional violation for Count Two or Count Five.  Accordingly, her claim of municipal liability must also fail, and Defendants are entitled to summary judgment with regard to Plaintiff's claim in Count Four.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment is hereby GRANTED, Judgment will be entered in favor of Defendants on all of Plaintiff's Claims, and Plaintiff's cause of action will be DISMISSED WITH PREJUDICE.

_____
UNITED STATES DISTRICT JUDGE